UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| MUMEEN STARKS, | Civil Action No. 18-16525 (SDW) |
| Petitioner, | |
| v. | OPINION |
| BRUCE DAVIS, et al., | |
| Respondents. | |

**WIGENTON**, District Judge:

Currently before the Court is the petition for a writ of habeas corpus (ECF No. 15) filed by pro se Petitioner Mumeen Starks after his previous habeas petition was dismissed without prejudice as an unexhausted mixed petition. (*See* ECF Nos. 13-14). Following an order to answer, Respondents filed an answer to the petition. (ECF No. 17). Petitioner did not file a reply. For the following reasons, Petitioner's habeas petition is denied, and Petitioner is denied a certificate of appealability.

**I. BACKGROUND**

In its opinion affirming Petitioner's conviction, the Appellate Division summarized the factual basis for Petitioner's conviction as follows:

> On April 18, 2008, [Petitioner] had a verbal altercation with Tynesha Morris on a sidewalk in Newark. Following the clash of words, Morris entered the vehicle of her cousin, Theo Stewart. As Morris and Stewart sat in the car talking, [Petitioner] approached the driver's side door with a handgun and fired several shots into the vehicle. Stewart pushed Morris out the passenger door and fell on top of her. He was struck by two bullets and died as a result of his wounds.
>
> An Essex County Grand Jury returned a four-count indictment charging Starks with first-degree murder[,] first-degree attempted murder[,] second degree unlawful possession of a firearm

1

> without a permit[,] and second-degree possession of a weapon (a firearm) for an unlawful purpose[.] Separately, [Petitioner] was indicted for other crimes committed on April 23, 2008; in Newark, including third-degree unlawful taking of a means of conveyance[,] second-degree eluding police[,] and fourth-degree resisting arrest[.]
>
> At the trial for homicide and related events, three witnesses identified Starks as the shooter, [1] and he was convicted by a jury of murder, aggravated assault as a lesser-included offense of attempted murder, unlawful possession of a firearm without a permit, and possession of a firearm for an unlawful purpose. Several defense motions for a mistrial were denied during the proceedings, and the trial court rejected Stark's request to include a jury instruction on passion/provocation manslaughter.
>
> After the verdict, [Petitioner] entered a negotiated guilty plea to the unlawful taking of a means of conveyance and eluding [charges]. Thereafter, [Petitioner] was sentenced to an aggregate term of life in prison[.]

(Document 9 attached to ECF No. 9 at 3-5). Petitioner appealed, and the Appellate Division affirmed his conviction and sentence. (*Id.* at 5-19). The New Jersey Supreme Court thereafter denied Petitioner's petition for certification. (Document 10 attached to ECF No. 9).

Following the conclusion of his direct appeal, Petitioner filed a petition for post-conviction relief in which he raised numerous ineffective assistance of counsel claims, including one in which he asserted that counsel failed to pursue an alibi provided by Petitioner. Following an evidentiary hearing, the PCR court denied that petition. (Documents 14-15 attached to ECF No. 9). In affirming the denial of post-conviction relief, the Appellate Division summarized that hearing as follows:

---

[1] "At trial, the State presented eyewitness testimony from Morris, her cousin, Frank Parker, and their mutual friend, Demetrius Heyward. Parker and Heyward testified to recognizing [Petitioner] from the neighborhood. Heyward saw [Petitioner] pull out a gun and fire three to four shots within two feet of him. Parker heard the gunshots and saw [Petitioner] running from the scene. Morris observed [Petitioner] holding a gun immediately after the shots were fired. [Petitioner] was described as wearing a black hoodie with a distinctive multi-colored design." (*See* Document 20 attached to ECF No. 9 at 3-4).

2

Six witnesses testified at the evidentiary hearing. Trial counsel and his investigator testified for the State, and [Petitioner], his mother, his sister, and his grandfather testified for the defense. [Petitioner]'s mother, sister, and grandfather, all of whom resided with [Petitioner at the time of the shooting], testified consistent with their respective certifications that [Petitioner] was home on the night of the homicide. [Petitioner]'s mother testified that [Petitioner] returned home at approximately 7:00 p.m. and stayed home for the rest of the night. She specifically recalled checking on him at approximately 11:00 p.m. and 2:00 a.m. and he was asleep with his one-year-old daughter. Although she never provided the information to the authorities when [Petitioner] was arrested and charged, she provided the information to an investigator and expected to be called as a witness at [Petitioner]'s trial. However, despite attending most of the trial proceedings, she was never called to the stand.

[Petitioner]'s grandfather could not specify what time [Petitioner] returned home. However, he testified that [Petitioner] was home before dinner, which was usually about 7:00 p.m., and stayed home with his daughter the rest of the night. Although he never provided the information to the authorities and was never interviewed, he too expected to testify at [Petitioner]'s trial and was never called. [Petitioner]'s sister testified that she saw [Petitioner] at home at 3:40 p.m. when she returned home from school. She testified that [Petitioner] asked her to babysit his daughter, but she refused. Although she could not specify exactly where [Petitioner] was in the house between the hours of 10:00 p.m. and 11:00 p.m., she testified that [Petitioner] was home all day and night and she wanted to testify to that effect but was never interviewed or called as a witness. Nonetheless, she also acknowledged that she never provided the information to the authorities once she became aware of [Petitioner]'s arrest.

[Petitioner] testified that he told his trial attorney, William Strauss, that he was at home at the time in question and that all the members of his household could vouch for him being there. [Petitioner] acknowledged that the notice of alibi and the defense witness list included the names he provided. [Petitioner] testified that he did not know that Strauss was not going to call the alibi witnesses until Strauss began his summation. When he confronted Strauss about it, Strauss responded that "he had won the case, he didn't need to call them." In his supporting certification, [Petitioner] averred that when he confronted Strauss about not calling the alibi witnesses, Strauss stated that "because they were my family, the jury would not believe them."

3

[Petitioner] also testified that he wanted to testify at trial. However, rather than prepare him to testify or explain the ramifications of testifying, Strauss simply "told [him] not to" and [Petitioner] accepted it because he did not know that he could go against his attorney's advice. [Petitioner] conceded, however, that during the trial, he answered in the affirmative when Judge Gardner asked him whether his attorney had explained all the ramifications of testifying or remaining silent and whether the decision to remain silent was his choice.

[Petitioner] testified further that he did not become aware of the trial stipulation agreed to by Strauss regarding the hoodie until 2012 when he was reading through his trial transcripts. According to [Petitioner], he would not have agreed to such a stipulation. On cross-examination, when [Petitioner] was asked whether he recalled Strauss stating on the record during the trial that he was stipulating to the hoodie to avoid the State calling the arresting officer to testify that [Petitioner] was wearing the hoodie when he was arrested on other charges, [Petitioner] denied hearing that colloquy despite being present.

Strauss, an experienced defense attorney who tried over sixty cases for the Public Defender's Office over twenty-five years, testified that he did in fact speak with [Petitioner] about his case on multiple occasions, and that [Petitioner] advised him of several family members with whom he resided as well as his girlfriend who could provide the basis for an alibi defense. According to Strauss, while the case was pending, he, [Petitioner]'s mother and three of his sisters discussed providing an alibi for [Petitioner] in the courthouse hallway after a status conference. In addition, Strauss testified that he had weekly telephonic conversations with [Petitioner]'s mother. Based on these conversations, Strauss filed a notice of alibi in anticipation of cooperation by the family members and requested his investigator, Michael Petrillo, to take statements from the witnesses to support an alibi defense. To corroborate his testimony, both the notice of intent to rely on alibi as a defense and the request for investigation were admitted into evidence at the hearing.

Petrillo confirmed that he was requested by Strauss to interview [Petitioner]'s girlfriend and eight of [Petitioner]'s family members, including [Petitioner]'s mother, grandfather and sister, to support an alibi defense. He obtained a statement from [Petitioner]'s mother that [Petitioner] was home on the night in question and that she checked on him repeatedly during the night. Petrillo also spoke with [Petitioner]'s grandfather but did not take a

4

statement from him.  None of the other witnesses provided by [Petitioner] responded or cooperated despite Petrillo's and Strauss' requests and representations by [Petitioner]'s mother and family members that the witnesses would cooperate.

      Strauss testified that when he started the trial, he intended to call the alibi witnesses.  However, he "felt that during the trial [he] was making some headway with some of the [State's] witnesses" and he did not believe that the alibi witnesses would "help us win the case."  Further, Strauss testified that because he did not have statements from the alibi witnesses, other than [Petitioner]'s mother, he was unable to assess whether there was consistency among them, and was concerned that none of the purported alibi witnesses had notified the authorities of [Petitioner]'s alibi when he was arrested and charged.  Regarding [Petitioner]'s mother, Strauss ultimately decided against using her as an alibi witness.  In addition to the fact that she would be subject to impeachment based on her relationship to [Petitioner], he had additional concerns about her credibility.  Specifically, her statement that it was impossible for [Petitioner] to be out of the house on the night in question because he had a small child was inconsistent with [Petitioner] being arrested a week later driving his girlfriend's car.

      Strauss testified that "[h]aving a family member or a friend testify to an alibi is not . . . airtight."  According to Strauss, in his experience, "if you put on an alibi that has any weakness you risk having the burden [of proof] shift from the State to the defendant" because "the jury's going to wonder . . . [w]hy are you putting on this alibi that doesn't really stand up?"  Strauss believed that "you're better off attacking . . . why [the State] didn't prove their case as opposed to putting on an alibi and risk losing . . . credibility[.]"  Strauss testified that he explained to [Petitioner] why he was resting without calling the alibi witnesses.  When [Petitioner] protested that he had eight witnesses compared to the State's three witnesses, Strauss "tried to explain to him that the number of witnesses doesn't overcome the credibility issues."  Strauss characterized his decision to not present an alibi defense as a strategic one, explaining that because there were three eyewitnesses who knew [Petitioner] from the past and placed him at the scene, "it was almost irrefutable that he was present at the scene.  And to put on an alibi in the face of that . . . , the jury would have not reacted well to that at all."

      Strauss testified further that he did explain to [Petitioner] the advantages and disadvantages of testifying at the trial.  Strauss acknowledged that [Petitioner] had no prior criminal record, lived approximately three miles away from the homicide scene, and

5

> would have denied being at the scene if he had testified. However, he explained to [Petitioner] that since "[t]he strategy is to concede that you were at the scene. . . . [I]f you get on the stand and testify to an alibi when the strategy is that none of these people saw what they claimed they saw then that just puts . . . our case at risk. According to Strauss, his discussion with [Petitioner] was "very civil" and [Petitioner] "agreed with" the strategy. Strauss testified that nonetheless "prior to going out on the record [he] made it clear to [Petitioner] it's his decision whether to testify or not. It's his right. And based upon that he . . . had to come out in court and he had to tell the court what his choice was."
>
> Regarding the hoodie, Strauss acknowledged entering into a stipulation with the prosecutor that the hoodie admitted into evidence at trial was the hoodie [Petitioner] was wearing at the time of his arrest. Strauss explained that by agreeing to the stipulation, he avoided any testimony by the arresting officer concerning the circumstances of [Petitioner]'s arrest, including the location and the ensuing eluding charge. Strauss testified that he told [Petitioner] what he was doing and why he was doing it and [Petitioner] said "fine." However, instead of instructing the jury that the parties agreed that the hoodie "was what [Petitioner] was wearing at the time of his arrest[,]" the court erroneously instructed the jury that [t]he parties agree[d] that this [was] the hoodie in this particular case." Strauss testified that although he was aware at the time that the court had misread the stipulation, as a matter of trial strategy, he did not object and call attention to the issue because he did not want to "highlight over and over this [hoodie]." In addition, Strauss did not request a curative instruction because "what the judge told the jury, while we didn't agree with that stipulation, was not inconsistent with my argument to the jury that my client was merely present at the time of the homicide."
>
> Following the evidentiary hearing, [the PCR judge] denied [Petitioner]'s petition in a written opinion. Preliminarily, [the judge] found the testimony of "trial counsel and his investigator . . . to be credible and the facts testified to by [Petitioner] and his family not to be consistent or credible." [The judge] noted that while Petrillo "testified consistently with . . . Strauss and corroborated trial counsel's version of how the investigation unfolded[,]" [Petitioner]'s family members were neither "consistent" nor "credible."

(Document 20 attached to ECF No. 9 at 8-16). Based on these credibility determinations and the testimony elicited at trial, the PCR judge denied all of Petitioner's ineffective assistance claims,

6

finding that counsel had adequately explained Petitioner's right to choose whether to testify, a fact confirmed by Petitioner's colloquy on the subject at trial, and that counsel's decisions as to the stipulation and potential alibi were proper strategic decisions based on counsels' experience and interactions with the proposed alibi witnesses. (*Id.* at 16-19). Petitioner appealed, and the Appellate Division affirmed the denial of PCR relief. (*Id.* at 20-27). The New Jersey Supreme Court thereafter denied Petitioner's petition for certification. (Document 21 attached to ECF No. 9).

## II. DISCUSSION

### A. Legal Standard

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." The petitioner has the burden of establishing his entitlement to relief for each claim presented in his petition based upon the record that was before the state court. *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013); *see also Parker v. Matthews*, --- U.S. ---, ---,132 S. Ct. 2148, 2151 (2012). Under the statute, as amended by the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244 ("AEDPA"), district courts are required to give great deference to the determinations of the state trial and appellate courts. *See Renico v. Lett*, 559 U.S. 766, 772-73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). Federal law is clearly established for the purposes of the statute where it is clearly expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States Supreme Court. *See Woods v. Donald*, --- U.S. ---, ---, 125 S. Ct. 1372, 1376 (2015). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Id.* Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

**B. Analysis**

**1. Petitioner's mistrial claim**

In his first claim, Petitioner asserts that the trial court denied him Due Process when it denied his counsel's motion for a mistrial after Heyward, on direct examination, testified that he had been told that Petitioner was the shooter in the underlying incident before he ultimately recognized Petitioner via a photo and suggested that he "guess[ed that the police] had an informant." (*See* ECF No. 17 at 25). This comment, which the state had apparently not expected, drew an immediate objection and motion for a mistrial from defense counsel. The trial judge sustained the objection, but denied the motion for a mistrial, and in turn instructed the jury that

8

they were to disregard any suggestion that an informant was involved in this matter as that statement was not part of the case and should not be considered during deliberations. (*Id.*). On direct appeal, the Appellate Division rejected the argument that a mistrial should have been granted, finding that the trial judge's sustaining of the objection and issuing of a curative instruction was "entirely appropriate and curative of any defect in the trial." (Document 9 attached to ECF No. 9). On habeas review, alleged errors of even a constitutional nature will be considered harmless and insufficient to warrant relief "unless [the alleged errors]" had a substantial and injurious effect or influence in determining the jury's verdict." *Fry v. Piller*, 551 U.S. 112, 116 (2007); *see also Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993). Here, a witness unexpectedly made a statement in which he "guessed" that there may have been an informant, the trial court immediately struck the statement from the record and instructed the jury to disregard it. In light of the considerable evidence – including multiple eyewitnesses – of Petitioner's guilt provided at trial and the swift action of the trial judge to cure the improper speculation of the witness, this alleged error was clearly incapable of having a substantial and injurious effect upon the outcome of Petitioner's trial, and was thus harmless. Petitioner is therefore not entitled to habeas relief on this claim.

**2. Petitioner's ineffective assistance of counsel claims**

In his remaining three claims, Petitioner asserts that his trial counsel proved ineffective in relation to a proposed alibi defense, in his agreeing to and not objecting to errors in the trial court's recitation of a stipulation regarding Petitioner owning a sweatshirt matching that described by the eye witnesses, and in advising him not to testify on his own behalf. The standard applicable to such claims is well established:

>[c]laims of ineffective assistance are governed by the two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668 (1984). To make out such a claim under *Strickland*, a petitioner must first show that "counsel's performance was deficient. This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687*; see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007). To succeed on an ineffective assistance claim, a petitioner must also show that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299.
>
>In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005). A petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of reasonableness" under the circumstances. *Id.* The reasonableness of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel. *Id.* In scrutinizing counsel's performance, courts "must be highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.
>
>Even where a petitioner is able to show that counsel's representation was deficient, he must still affirmatively demonstrate that counsel's deficient performance prejudiced the petitioner's defense. *Id.* at 692-93. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. The petitioner must demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299. Where a "petition contains no factual matter regarding *Strickland's* prejudice prong, and [only provides] . . . unadorned legal conclusion[s] . . . without supporting factual allegations," that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief. *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010). "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible,

> > [*Strickland*, 466 U.S. at 697-98]," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

*Judge v. United States*, 119 F. Supp. 3d 270, 280-81 (D.N.J. 2015).

Petitioner first argues that counsel was ineffective in failing to pursue an alibi defense. As Petitioner has not shown that the PCR court's factual and credibility findings were incorrect by clear and convincing evidence, this Court is required to presume those findings to be accurate, and thus must accept the PCR court's credibility determinations. *See, e.g., Dennis v. Sec'y, Penn. Dep't of Corr.*, 834 F.3d 263, 281 (3d Cir. 2016). Based on those findings, it is clear that trial counsel and his investigator explored Petitioner's proposed alibi, found his proposed alibi witnesses to be weak in the face of the eyewitnesses and the defense he had chosen to pursue, and as a matter of strategy declined to pursue the alibi after a thorough investigation. In light of the PCR judge's finding that Petitioner's proposed alibi witnesses were not credible, that in hindsight appears to have been a wise decision. Regardless, as a strategic decision made after a thorough investigation, trial counsel's decision to eschew the alibi defense in favor of arguing that Petitioner had not been the shooter is "virtually unchallengeable," and does not amount to deficient performance. *Strickland*, 466 U.S. at 690-91. Likewise, in light of the PCR court's credibility findings, Petitioner has failed to show he was prejudiced as a weak alibi is likely to do more harm than good. Petitioner's first ineffective assistance claim thus fails to set forth a valid basis for habeas relief.

Petitioner next argues that trial counsel proved ineffective in stipulating to the admission that Petitioner owned the hoodie entered into evidence and in not attempting to correct the trial court's misreading of the stipulation. Given the PCR court's credibility findings, and counsel's explanations for his strategic decision both to enter the stipulation – to avoid a police officer

potentially being able to discuss having arrested or otherwise encountered Petitioner wearing it – and in not objecting to the misreading of the stipulation – to avoid placing undue emphasis on the hoodie and thus giving the jury more reason to consider its import to the eyewitnesses' identification of Petitioner as the shooter – this Court once again concludes that trial counsel made reasonable strategic decisions which do not amount to deficient performance.  Likewise, Petitioner was not ultimately prejudiced by the stipulation or the trial court's misreading of that stipulation – it avoided unnecessary police testimony regarding Petitioner's ownership of the distinctive hoodie and avoided the exact undue emphasis counsel identified, both of which could only have served to weaken Petitioner's case that he was present at the scene but had not been the actual shooter.  The entrance of the hoodie into evidence was essentially unavoidable and counsel acted as he did to reduce the effect of that entrance as much as possible, and his decisions related to the stipulation were therefore not ineffective assistance of counsel.  Petitioner's second ineffective assistance claim thus fails to set forth a valid basis for habeas relief.

In his final claim, Petitioner contends that he was improperly denied the right to testify on his own behalf and that counsel was ineffective in advising him in relation to his choice not to testify.  Based both on counsel's credible testimony during PCR proceedings and Petitioner's colloquy with the trial court, the PCR courts rejected this claim, finding that counsel had adequately explained Petitioner's right to testify to him and that Petitioner, in light of counsel's adequate advice on the risks of testifying on his own behalf, had chosen not to take the stand and had confirmed that fact to the trial court.  Giving these factual and credibility findings deference as this Court must in light of Petitioner's failure to show that these findings were inaccurate or unreasonable, *see Dennis*, 834 F.3d at 281, Petitioner has failed to show either that he was denied his right to testify on his own behalf in light of his own informed decision to decline to testify, or

12

that counsel proved ineffective as counsel did in fact advise him on the risks and advantages of testifying and clearly told Petitioner that it was his decision, not counsel's, whether he should testify. As Petitioner has not shown that counsel was ineffective in light of the advice he was given, and as it is clear that following this advice Petitioner specifically chose not to testify at trial, he has failed to show any valid basis for habeas relief on his final set of claims. As Petitioner has failed to show an entitlement to habeas relief on any of his claims, his habeas petition is denied.

### III. CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. §2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of a state court proceeding unless he has "made a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). As Petitioner's claims are without merit for the reasons discussed above, Petitioner has failed to make a substantial showing of the denial of a constitutional right and he is denied a certificate of appealability.

### IV. CONCLUSION

For the reasons set forth above, Petitioner's habeas petition (ECF No. 15) is DENIED, and Petitioner is DENIED a certificate of appealability. An appropriate order follows.

Dated: November 16, 2020                    *s/Susan D. Wigenton*
                                            Hon. Susan D. Wigenton,
                                            United States District Judge

13